The next matter on our calendars, R.C. and D.C. v. Board of Ed. of Wappinger School District. Good morning. Good morning, Your Honor. May it please the Court, Ben Heinerfeld and Gina DiCresenzo on behalf of the parents and their daughter. And against the school district. This case, in a word, is really about safety. And our briefs might have had a Rube Goldberg kind of effect in terms of getting there. But all the arguments flow to the idea that at the moment the parents had to decide whether to enroll their daughter, N.C., in the school proposed by the school district, they had to decide whether she would be safe there. And the word safety is not too strong a term. If you look at the history of this case, the year prior to 2012-13, N.C. had missed 105 days of school because she was unable to attend due to anxiety and due to what they called a prodromal psychosis. She was, as you saw in the record, she had auditory and visual hallucinations. So if you fast forward to December of 2012 and January of 2013, suddenly the parents are trying to find a placement for N.C. where she would not experience this same form of psychosis. And the uncontroverted expert testimony is that she was at risk. She was at risk if she were to experience certain sensory triggers. So what did they do? The school district, during the fall of 2012, suggested a few schools. None of them was appropriate. Then the parents said, hey, we have this great potential placement, Maplebrook. It's sort of this bucolic place up in Amenia, New York. It's very, it won't be stressful for her. And she'll be able to go and she won't experience these triggers. What did the school district say? Great. Try it out. And she did. And so she spent a week there and had a great time. Did she do well? She did great. It's in the record. Then after, the day after her trial, the school district's, the chair of the Committee on Special Education, Mr. England, said, oh, sorry. Our bad. She can't go to Maplebrook because it's not state approved. Send her to Carafin. And now, Carafin is the sort of. You agree it's not state approved, right? It's not on the list of approved private schools. It is. And this is. Sure. This is kind of the inconsistency in the way this whole thing works out from a policy standpoint. So the district, if they place her there and it's not an approved school, can't get reimbursement from the state, right? But, but, but, I think you'll find that's the case. But, but, under existing Supreme Court precedent, if that's the place where she's going to get a free and appropriate education, she has to go there. There's. I think this Court ruled in a case that we didn't know inside of Andrzejczyk, I think it's called, that that's right. The Carter decision. Which is right. What I just said is right. Right. That there is this sort of, this sort of donut hole, if you will. But the Carter decision basically says that the range of placement should be broad enough that it can include a school that doesn't provide what is required of a school district to provide FAPE. That's pretty clear. You mean there are alternative sources of reimbursement if NC went to Maplebrook? To be honest, as a parent's attorney, we never really sort of get behind the curtain as to how they get reimbursed. So I think my opposing counsel would know better than I whether. But you would agree with me that given that fact, the school district's suggestion of an alternate school doesn't. I mean, it's not like the school district suddenly just for some arbitrary reason suggested the other school. They suggested another school. And then the question is whether that school would have provided a free and appropriate public education, right? Yes. It doesn't have to be better than all it has to be is adequate, right? Sure. Okay. So it's not a question of whether Maplebrook is better than the other school. The question is whether the other school would have met her needs, right? That's correct. Okay. So that's where we focus. Absolutely. And that's where. Most of these cases we see the school district is trying to keep the child in district. And the debate is always centers around both the IEP and the individual education plan, individual education plan, and whether the school district is able to meet those needs. But here, everybody agrees she needs an out-of-school placement. The question is where is, which place is that? Right. And what I want to do is kind of put you in the shoes of the parents in January of 2013. This is really important. They had a daughter who was at risk of becoming full-blown psychotic. And so I think the IHO was right. I know he was right. He said you can't take that risk. You have to find they're entitled to an assurance that whatever placement. It goes to the equities, but it doesn't go to, it certainly goes to the equities, but it doesn't go to which school is, fits, meets, is fair and provides the fair and adequate. Well, let me refer you to one of the cases that we cited in our brief, which is. Let me get to the chase for a second. Sure. At the school where the parents wanted her to go, Maplebrook. Maplebrook. Didn't both the principal and the school psychologist testify that they did not have a plan for managing her anxiety? They didn't have a formal plan? There was not a formal plan to manage her anxiety. I think what they referred to was a behavior plan, which is a term of art in special education. NC did not have traditional behaviors. What she had was a psychological condition. And there's a huge distinction. You're not going. Did they testify about how that school was going to provide a therapeutic environment for her? Yeah. Oh, they did. Yes. I mean, I can't cite chapter and verse right now. Is that why the state review officer rejected the conclusions of the IHO? Well, he rejected the conclusion that Maplebrook was appropriate, citing a few incidents that occurred. And our argument is you don't look at incidents, you look at the totality of the circumstances. You say, how did Maplebrook do? Keep in mind Carter. The Carter decision from the Supreme Court says it doesn't have to be a free appropriate public education because parents are faced with a situation where they don't have a FAPE. They don't have a free public education, so they have to seek a placement elsewhere. So the parents get a little leeway. And on the whole, NC did great at Maplebrook. She missed 105 classes in public school. She didn't miss any class at Maplebrook. There were six incidents that have been litigated in every stage of this case, and this is the fourth case. In 15 months there, six incidents for a young woman who has a psychosis, that's pretty good. That's less than one a month. And some of these incidents are pretty minor. So on the whole, she was able to access her education at Maplebrook. She did really well there. She worked towards independence. She got good grades. These are all the things that when you look at the totality of the circumstance, you have to say, we submit that Maplebrook was more than adequate. And the district court herself. What about her third year there when she wasn't then pursuing a diploma? What does that say to the equities there? I mean, didn't she attend for an additional third year at Maplebrook, and wasn't it specifically indicated that she wasn't in pursuit of a diploma to graduate at that point in time? She was not ready to receive a diploma. She was not ready to graduate because she hadn't, based on the IDA prescribed understanding of what transition is. But the measure is academic as opposed to, I mean, there's no, the school doesn't have an obligation to have her reach certain emotional stability goals. It's that she reaches certain educational goals, doesn't it? I disagree. I think a free, appropriate public education can extend beyond mere academic. So that a student who has actually completed their, all their studies to get a state diploma, could continue to attend a school because they have emotional needs? I don't think so. I respectfully disagree. Okay. It's a change in placement. That's the best case for that. I honestly can't give you a case for it. I'm anxious to see the second. It seems to me that what we're wrestling with here, at least what we have always, I think, traditionally wrestled with is whether what the committee offered and proposed, and I'm forgetting the name of the school. It begins with a K, not Maple Grove. Cariffin. Right, right. Whether that, whether the parents liked it or not, whether that provided a FAPE. It's not about whether they liked it. It's about whether it was safe for NC. No, it's whether the proposal provided a FAPE. Correct. Right? And that's really the first problem. Yes. So is everybody in agreement that that school did not provide a FAPE? Well, everyone on this side of the V is in agreement. Well, I understand that. But, I mean, that's the hurdle that you've got to get over. Because regardless of whether there's, you know, a thousand better alternatives out there, all they had to propose was a FAPE. I'm sure your opposing counsel will educate or elucidate us. Our submission is that the committee on special education itself didn't truly believe that Cariffin could provide a FAPE. But that's in dispute, right? I mean, you have somebody who said, who doesn't recall saying it, to the mom. I don't think this is the right place. Right. And we say that's not in dispute. I believe all three of you were trial attorneys. This was a fact decided by the fact finder. I disagree with the IHO on a finding of fact. They can if they have a reason to do so. Okay. They have to have a reason to do so. And they didn't articulate one in this case. Okay. But it is a fact that the school psychologist didn't have a unilateral vote with regard to where the child's place, right? It's the committee's choice, right? The crux of our argument was that there was no one else on the committee that could even possibly make a decision. But let's talk along, counsel. Okay? Sure. Does the school psychologist have a unilateral vote to decide where the child's place? The answer is no. Right. Thank you. All right. You've reserved some time for rebuttal. Actually, two minutes. We'll hear from the city, the Board of Education of the city. Good morning. May it please the Court, Neal Andren Chaudhry for the Appellate Board of Education of the Wappinger Central School District. Counsel, I was distressed when you accused these parents of bad faith. This child was in the school district for up to the 11th grade. How can you accuse them of bad faith by seeking to spread out the senior year for two years if she wasn't emotionally ready? Because the school year in which she was placed in Maplebrook, the unilateral placement, was already going to be her second school year, second senior year, and that was established in the record that she was completing the 2013-14 school year as her second senior year. That would have been her second senior year had she remained in the district program. And then there was that document in the record that indicated that the parents in September of 2013 wanted to spread out her senior year for another year without foreseeing whether or not she could complete the program. So they had already predetermined that she was going to be in school again for 14-15 at the district's expense. Her third senior year. Essentially. They knew this child. They knew this child. They knew her state. They knew her state of anxiety. Why would you think it was bad faith just to get reimbursement when they tried for years to work with the school district? Because it presumes that she would require that third senior year. There's nothing in the record to suggest that she may or may not need a third senior year. At the time, the document that was in evidence suggested that she would need a third senior year. It's entirely speculative. And for the parents to suggest that she would need a third senior year at taxpayer expense, completely at taxpayer expense, going to your question before about who pays for it because it's not an approved placement, I think puts the cart before the horse. And that's why we submit that that was bad faith on the part of the parents. Was there anything in the record that showed how she did in the first full year that she was at Maple Grove? She was only there for half the year in the 2012-13 school year. It was the spring semester. And there is something in the record with regard to her having hallucinations as well as. . . No, no, I mean in terms of how she had progressed in terms of her studies. I'm not talking about her emotional difficulties. I'm separating that out because we've been asking you about the fact that you had some sense that the parents were not operating in good faith when they talked about projecting her into a third additional year as a senior. And my question is what does the record tell us about how she was doing academically with regard to meeting certain goals at the completion of that first half year at Maple Grove? We would agree that she met some of her academic goals based off the Maple Brook curriculum, which for the record is not a regent's curriculum. So what does she need a regent's diploma for? She needs a way to support herself. And they had a work-study program that Kerafin didn't. Parents were very interested in the work-study program because that would allow her to have a life after she graduated from high school. Well, there is nothing in the record to suggest she was enrolled in the work-study program while at Maple Brook. And there is evidence in the record to show that the CSE chair at the time before she was placed in Maple Brook. In fact, when the CSE had recommended to Kerafin that the district would make arrangements for a work-study program. So the parents were aware of that fact. She was doing work-study when she was at the school district, right? She was. That was a positive aspect of what she was up to. That is correct. And the reason she stopped was in November of 2012 because she had decompensated and she had required additional supports outside the school setting. And that's when the CSE had recommended Kerafin in February of 2013. So the FAPE was study at Kerafin, but we will add to that a work-study program? That's correct, and that is in the record. Okay. Thank you. And that didn't happen at Maple Brook? Maple Brook had those two things together, but the FAPE included those two things. FAPE, you mean as far as the district's responsibility? The district's FAPE. Yes, it's in the record. The district offered, as a free and appropriate public education, offered Kerafin plus a work-study program in addition to that. That is correct. But Maple would have such a work-study program as well, didn't it? They claimed to have had a program. It's not clear that she was enrolled in such a program and that was beneficial to her, given the amount of time she actually missed from instruction, contrary to what my colleague had stated to you and what's stated in their briefs. There was significant time missed due to her behavioral issues and her emotional decompensation. She missed 100 days when she was at Kerafin, wasn't she? She was never in Kerafin. When she was in the last year in public school, she missed 100 days? That's correct. How many days did she miss at Maple Brook? She was actually removed as a residential student for two months, even though the parents had requested a residential program, which is the heart of the case here, that they wanted a residential program, not necessarily the Kerafin program, which is an out-of-district day placement. And then she was out of school completely for one week. Prior to that, in January of 2014, she was missing school at least two times a week because of her hallucinations. That was actually the testimony from the Maple Brook psychologist, and that Maple Brook, and it is correct that they did not have any behavioral interventions or strategies to deal with her hallucinations while she was in class. Well, we'll hear from opposing counsel. I thought they did have such a program to deal with the hallucinations. Maple Brook? Yes. Now, our position is that there was no such program available in Maple Brook to deal with her behavioral issues. Counsel alluded to six. Behavioral meaning hallucinations. Hallucinations, the inability to remain in class. And keep in mind, the parents fought for a residential program. They didn't dispute the contents of the IEP, the goals, the actual program itself. What the parents want is a more restrictive setting than what the SRO believed could be achievable through the IEP. They fought for a residential placement regardless of what was contained in the IEP. So if they want a residential placement, then they have to have a residential placement that can deal with it. I thought she did better in the residential program when she went for the one-week test. She did very well at the residential program. Well, that's not the actual unilateral placement that they're seeking. That was just a trial period. Once she was actually enrolled in Maple Brook, she decompensated greatly. Counsel alludes to six minor incidents. All those incidents were situations that, and it's important to make this clear, that the SRO believed were to be more than minor. What's being lost here is that this is a review of an administrative proceeding where the SRO determined that these incidents, among other things, including the lack of an actual behavior plan, would likely lead the SRO to conclude that the program is not appropriate. The reason I bring this up is because, as this Court is well aware, you have modified de novo review of the administrative record, which means you can make determinations of law, but with regard to educational determinations, you would give deference to the administrative agency's determination. Wait. Remind me. Do we give to the district court's determinations with respect to those issues? You don't have to give anyway because the district court is bound to the same modified de novo review as you are. But as this Court set forth about five years ago in RE and MH versus New York City Board of Ed, when there is a dispute between the two administrative agencies, New York being one of the few states that has a two-tiered administrative system, when there is a dispute between the IHO, which is the first level, and the SRO, which is the second level, the general rule is you give deference to the more well-reasoned decision. We submit that the SRO decision is by far the more well-reasoned decision on both prongs, on both Burlington prongs, but since we're talking about prong two. Judge Seibel's decision. Absolutely, Your Honor. Absolutely, Your Honor. With regard to prong one, with regard to prong two, which Judge Seibel did not have to reach because she ruled in favor of the district in prong one, with regard to prong two, the SRO treated these incidents in the second to last page of the decision and devoted an entire page of analysis towards those incidents. Whether or not those incidents carry any weight is an educational determination that the SRO deemed important enough to give weight to. Those facts that were reviewed by the SRO were simply not reviewed by the IHO in any form whatsoever. Therefore, if you go by your own decision in RE, when you give deference to the more well-reasoned decision, the SRO actually addressed those issues. There's simply nothing in the IHO decision that addressed those issues and whether the Maplebrook program was appropriate because of those incidents, as well as the lack of behavioral interventions. Additionally, as this Court ruled in Hardison about three years ago, evidence like this is the type of evidence that this Court specifically looks at when they determine whether or not the SRO engaged in a thorough analysis, particularly what facts were looked at and what facts were not looked at when comparing between the SRO and the IHO. Thank you. Thank you. Counsel, you reserve two minutes for rebuttal. Thank you, Your Honors. Two quick points. For the prong one of the analysis, as we briefed, the SRO relied on a lot of evidence it should not have relied on. So its two primary witnesses were the principal of Carafin, who didn't show up until the trial and never go to a CSE. Didn't go to any CSE meetings. And so this points back to what the parents knew in February of 2013 and August of 2013. Yes, but not as to whether Carafin provided a free and appropriate public education. What the parents knew, I mean, that may go to good faith or not, but it doesn't go to whether the school district proposed a free and appropriate public education. It does, if I may explain. Go on. The reason that she was being placed at Carafin was because she had very unique psychological needs. So it wasn't about the IEP. The IEP in this case didn't change. The IEP didn't change for years. But when they were supposed to place her at Carafin, the reason they visited Carafin was to see whether she would be able to handle it, whether it would have the sensory triggers. Both the parents and the school's own psychologist said no, she won't be able to handle it. Parents, when they had to make the decision whether to place her at Carafin, why shouldn't they rely on their own instinct and the school's own psychologist who said don't place her there? Although that was a disputed fact, wasn't it? It was disputed and settled. This is a really important point. I don't get that. I mean, it just makes no sense to me. I'm sorry to tell you that. But that's not the point. The point is, is whether the placement at Carafin was a free and appropriate public education. Whether the school psychologist said that I think this one's better than the other one is not the ultimately deciding factor. The question is, is whether Carafin was appropriate. Now, let me ask you very briefly. Did Maplebrook staff, were they trained in crisis intervention? With crisis intervention? Yes. During the day, they did. In the residential portion, they did not. And they were not, there was no one trained in crisis intervention at night? There was no one on call 24-7. No supervision. There was supervision, but it was not, it was supervision by like an RA, the equivalent of a dorm RA. And if NC engaged in an outburst, what was Maplebrook's response? To talk to her. Oh, I'm sorry.  Administered medication or contacted mom and dad. Did NC sneak away from the people that were keeping an eye on her and shave her head? Sure, that's one of the six incidents. Weren't they relevant with regard to the SRO's determination that Maplebrook was not as good a placement as Carafin? And that the record didn't support placing her at Maplebrook? It was a relevant consideration. Did the IHO mention any of those incidents? No. No, we didn't. Okay, thank you. Thank you. Thank you. Thank you both.